IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 14-cv00206-RBJ

KEY EQUIPMENT FINANCE, a division of KeyBank National Association,
a national banking association,

    Plaintiff,

v.

SOUTHWEST CONTRACTING, INC., a Florida corporation and
MATTHEW DAVID FULFORD, individually,

    Defendants.

## ORDER

This case is before the Court on defendants' motion for partial summary judgment and plaintiff's cross-motion for summary judgment. Defendants' motion is denied. Plaintiff's motion is granted, and final judgment will enter in favor of the plaintiff as directed.

**FACTS**

The following facts have not been disputed except as otherwise noted.

<u>The Leasing Documents</u>.

On July 13, 2006 Key Equipment Finance ("KEF") and Southwest Contracting, Inc. entered into a Master Equipment Lease Agreement whereunder KEF financed Southwest's purchase of a used dredge. ECF No. 1-2.[1] The purchase price was approximately $770,000.

---

[1] A dredge is used for excavation of material beneath the surface of water.

The Master Lease provided that in the event of Southwest's default on payment of rent, interest would accrue at the default rate of 18% per annum; Southwest would be charged a five-percent late fee; and Southwest would pay the costs and expenses of collection. *Id.* at ¶¶18(a),(b) and 21. In addition, in the event of a default KEF was authorized to take possession of the dredge and to sell it in a public or a private sale. *Id.* at ¶18(b)(iv, vi). The Master Lease provided that Southwest's duty to pay rent and to perform its other obligations would not be subject to any right of set off, counterclaim or defense. *Id.* at ¶8.

Southwest had between 200 and 300 employees. ECF No. 64-9 at 41. Its President, defendant Mathew David Fulford, personally guaranteed Southwest's performance under the lease. *Id.* at 11. Southwest's performance was also guaranteed by Southwest Concrete, Inc. Mr. Fulford was the President and sole shareholder of Southwest Concrete.

The Master Lease incorporated the terms of any equipment schedule executed in connection with the lease. Equipment Schedule No. 01 concerning the dredge was executed contemporaneously with the Master Lease. ECF No. 63-1. Among other things it granted KEF a first priority security interest in the dredge. *Id.* at ¶6(a).

The Master Lease gave KEF a number of options in the event of a default, including instituting a court action to recover damages for breach; taking possession of the dredge; and/or, after 10 days' prior notice to Southwest of any public sale or of the time after which a private sale might be negotiated, disposing of the dredge on an "as-is, where-is" basis in compliance with applicable law and with such preparation as KEF determines to be commercially reasonable. ECF No. 1-2 at ¶18(b)-(d). It also provided that Southwest would bear the entire risk of loss for the dredge. *Id.* at ¶13.

In 2009 Southwest defaulted by failing to make rent payments when due.[2] The parties then entered into a Workout Agreement, effective June 9, 2009. ECF No. 1-4. The Workout Agreement provided that the total indebtedness owed by Southwest as of that date was $594,112.70 and would be paid according to a monthly schedule with a final balance due on July 1, 2012. *Id.* at ¶2.

The Workout Agreement provided that, except as expressly modified therein, the terms of the Master Lease remained in effect. *Id.* at ¶3. It confirmed that KEF had the right to enforce the terms of the Master Lease without setoff, defense or counterclaim, adding that "[t]o the extent that such setoff, defense or counterclaim may presently exist, SOUTHWEST hereby releases and waives the same." *Id.* Both guarantors acknowledged and reaffirmed their guarantees. *Id.* at ¶4.

The Workout Agreement further provided that, in the event of a default, the balance of the total indebtedness would be due and owing "without further demand, presentment, notice of dishonor and protest or any other notice to SOUTHWEST or either of the Guarantors whatsoever. *Id.* at ¶5. Upon default KEF would be entitled to "exercise all rights and remedies available, as stated in the Lease Documents, under the Uniform Commercial Code, or otherwise at law." *Id*.

On October 1, 2009 Southwest defaulted under the Workout Agreement by failing to make a rent payment when due. KEF states that it accelerated all amounts due under the Master Lease and demanded payment in full. Southwest admits the default but denies that it received a

---

[2] Southwest also dropped its insurance coverage on the dredge. *See* ECF No. 64-9 at 123-25. This was contrary to ¶14(a) of the Master Lease.

notice of default or a demand for payment of the unpaid balance due. However, it is undisputed that Southwest has not made any payment since the October 1, 2009 default.

The Dredge

According to Mr. Fulford, Southwest used the dredge for about 12 months, but then, due to the bad economy, it sat idle for about a year to a year and a half. ECF No. 64-9 at 36-37.[3] At some point a gentleman by the name of Jerry Farmer learned that Mr. Fulford wished to sell the dredge, and he referred a couple of potential customers to him, but nothing came of it. Mr. Farmer at that time had nearly 40 years in the dredging industry and had bought and sold, and built and rebuilt, dozens if not hundreds of dredges. His previous company had rebuilt and sold this very dredge in the early to mid-1990s. Mr. Fulford describes him as a salesman with whom he had bought and traded equipment for something like 10 years. *Id.* at 66.

Mr. Farmer was aware that Mr. Fulford needed to do something with the dredge, and when he learned that there was a need for a dredge on a job near Blair, Nebraska, he contacted Mr. Fulford to see if he wanted the job. Southwest did not take it, but it leased its dredge to business called WCP Dredging for that purpose.[4] The proprietor of WCP Dredging was a gentleman named William C. Peltz who had worked with Mr. Fulford as a subcontractor to Southwest for several years. ECF No. 64-9 at 66-67. The dredge was transported to the job site.

Mr. Peltz, whom Mr. Farmer described in his deposition as a "lost ball in tall grass," ECF No. 64-10 at 22, left the dredge in freezing water during the winter of 2009-10 and apparently

---

[3] I will cite deposition testimony to the deposition page number, which might be slightly different than the ECF page number.

[4] The Master Lease prohibited the sale or sublease of the dredge without KEF's written consent. ECF No. 1-2 at ¶12(a). It also prohibited removal of the dredge from its location in Florida without KEF's consent. ECF No. 1-2 at ¶7. However, Mr. Fulford admits that he did not obtain KEF's consent for the lease of the dredge to Mr. Peltz or for moving it to Nebraska. ECF No. 64-9 at 63-64.

4

abandoned it. When the ice thawed the dredge was submerged in water and mud. Mr. Fulford described that as "the first time it was sunk." *Id.* at 124.

In approximately the beginning of May 2010, by then aware of the dredge's location in Nebraska, KEF hired Asset Control Services, Inc. ("ACS") to inspect the dredge and report on its condition. ACS is a company that provides asset management services including inspections, appraisals, repossessions, and remarketing for commercial banks and leasing companies. ECF No. 64-11 at 6. According to the deposition testimony of ACS's President, Keary Hutchinson, ACS was also asked to provide a rough value, although not an appraisal as such, for the dredge. ECF No. 96-11 at 6-10. Mr. Hutchinson testified that, including this engagement, ACS has been involved in the repossession or sale of four or five dredges. *Id.* at 8.

ACS began its work by hiring a local individual named Mike Stratman who had been referred to ACS as a knowledgeable dredge person and who was described by Mr. Hutchinson as someone who actually operates dredges. *Id.* at 13. Mr. Stratman inspected the dredge on May 6, 2010 and determined that it would need many hours of service to put it back into operating condition. Mr. Hutchinson characterized its condition as "poor." *Id.* at 17-18.

ACS reported Mr. Stratman's findings to KEF and provided a rough estimate that the dredge had a fair market value of $100,000 to $125,000 and an orderly liquidation value of $75,000 to $85,000. Report, ECF No. 64-12 at 3. Mr. Hutchinson testified that the valuation was based on comparables in the market, speaking with people who deal with selling used dredges, and ACS's 30 years' of being in this line of work. ECF No. 64-11 at 16-17. He described this as essentially the same process as an actual appraisal but without a certified appraisal report. *Id.* at 17.

Repairs were apparently being done on the dredge when the Mr. Stratman's first inspection was done. *Id.* at 15. The refurbishing was apparently completed by May 17, 2010. *See* ECF No. 64-9 at 76, 78. That is the date of an email (that I have not seen) from David DaVisio of KEF to Mr. Fulford. Mr. DaVisio had been in contact with Mr. Fulford after Mr. Fulford's financial difficulties started. Mr. Fulford apparently had reported to him that the repairs were complete.

On June 22, 2010 Mr. Stratman inspected the dredge for a second time. *Id.* at 19-20. Based on that inspection ACS reported to KEF that it appeared that considerable work had been done on the dredge since the May 6 inspection, and that the dredge was much closer to being operable. Report, ECF No. 64-13. Mr. Hutchinson describes the condition of the dredge at this time as good or average, although he says it was still inoperable. ECF No. 64-11 at 21-22. ACS provided a revised estimate of fair market value of $175,000 to $200,000 and an orderly liquidation value of $150,000 to $175,000. ECF No. 64-13.

Mr. Fulford had no contact with the dredge after May 17, 2010. According to him, by then the dredge was on dry land waiting to be sold. He added, "I had already returned it to KEF. Key Leasing. I pretty much had told [Mr. DaVisio] that it's here. It's done. It's ready to be sold or repossessed or whatever." ECF No. 64-9 at 76. The dredge was not used until it was ultimately sold in July 2012, as discussed below. Mr. Fulford testified that he made some efforts to sell the dredge after May 17, 2010 through a broker named Rick King at a company he thought was called Dredge Brokers or something like that.[5] He received some calls from persons

---

[5] Defendants' retained expert, Fernando Sosa, contacted Mr. King during his preparation of his retrospective appraisal of the dredge. Mr. King's company is called Dredge Central. *See* ECF No. 64-5 at 13.

who didn't identify themselves, but he received no offers. *Id.* at 83-85.  On the other hand, he acknowledged that the dredge was not his to sell or give away until he paid KEF. *Id.* at 91.

Mr. Stratman visually inspected the dredge on or about December 10, 2010.  Based on that inspection ACS reported to KEF that the dredge appeared like it did at the June 22 inspection, and that overall it appeared to be in average to good condition and "reasonably ready to go to work."  ECF No. 64-14 at 2.  KEF directed ACS to market the dredge with an asking price of $250,000.  Mr. Hutchinson indicated that this was based on ACS's 2010 evaluation of a fair market value in the $175,000 to $200,000 plus some negotiation room.  ECF No. 64-11 at 31-32.

ACS's marketing efforts including listing the dredge on its website; listing it in a large Internet equipment site, Machinery Trader; and calling buyers with whom ACS had worked on that type of equipment over the years.  *Id.* at 32.  There were some inquiries, but although ACS's marketing efforts continued for approximately one and one-half years, no one inspected the dredge or made an offer.  *Id.* at 31, 57.

At some point Mr. Fulford had asked Mr. Farmer to try to sell the dredge.  *Id.* at 49. According to Mr. Farmer, Mr. Fulford thought he could get the dredge from KEF for nearly nothing and suggested that so long as he netted $100,000 out of the proceeds, Mr. Farmer could have whatever was left.  *Id.* at 40.  Mr. Fulford denies that he made such an offer.  ECF No. 64-9 at 91.  In any event, Mr. Farmer declined to try to sell the dredge for Mr. Fulford.  ECF No. 64-10 at 41-42.  He states that the dredge had been described on websites in various ways that he didn't think were appropriate, and "I just decided I didn't want to be involved in it." *Id.* at 42.

In 2011 the Missouri River Basin overflowed its banks, causing the dredge – which was located on the river's bank – to be partially submerged. Mr. Fulford testified that he was told by the individual on whose property the dredge was located that the dredge was not damaged in the flood. ECF No. 64-9 at 42. Based on that report Mr. Fulford does not believe that the dredge sustained damage in the flood.

In July 2012, while the dredge was still sitting in "dry dock" near Blair, Nebraska, Mr. Farmer came back into the picture again. He had become aware that the dredge had been affected by the 2011 flooding, and he inspected it on or just before July 6, 2012. In his deposition Mr. Farmer characterized the dredge in its condition at that time as "junk." *Id.* at 58. However, he thought he could probably sell the dredge for salvage value for $125,000, maybe $150,000 if he got lucky. *Id* at 31-32. So he told ACS about the flooding, expressed his opinion that the condition of the dredge had changed, and made an offer to buy the dredge for $75,000. ECF No. 64-11 at 38-39.

ACS did not initially believe that the offer represented fair market value, but it sent Mr. Stratman out to inspect the dredge again. He determined that the dredge had not sustained further structural damage, perhaps explaining the property owner's belief that no damage had occurred. However, Mr. Stratman reported that the condition of the dredge now was poor, and it was not operable. Based on Mr. Stratman's report Mr. Hutchinson believed that the fair market value of the dredge "had decreased significantly," perhaps as much as $125,000 (from the $200,000 high end of ACS's fair market valuation in June 2010 down to what Mr. Farmer was offering). ACS reported to KEF, and KEF accepted Mr. Farmer's offer. ECF No. 64-11 at 40-46.

The paperwork was being prepared when Mr. Farmer agreed to sell the dredge to a buyer in Texas for $185,000. ECF No. 64-16 at 25-30; ECF No. 64-10 at 50. Mr. Farmer's company, Dredge2, invoiced McEl Ltd of San Antonio, Texas $185,000 plus $15,000 for disassembly of the dredge, readying it for shipment, and loading it on trucks. ECF No. 63-7.[6]

On July 12, 2012 ACS on behalf of KEF completed the sale of the dredge to Dredge2 "as-is-where-is" for $75,000. KEF paid storage fees, the costs of the fourth inspection, and ACS's commission out of the $75,000. ECF No. 64-11 at 50-51. Mr. Farmer estimates that he spent at least $50,000 for the disassembly, make-ready and movement of the dredge to the trucks. ECF No. 64-10 at 60.

Mr. Farmer testified that he did not tell Mr. Fulford that he was looking to buy the dredge because he had been told by "the bank" that the dredge had been repossessed. *Id.* at 49-50. The parties have stipulated that neither Southwest nor Mr. Fulford was notified of KEF's intent to sell the dredge to Mr. Farmer or the actual sale of the dredge before the sale was completed. Mr. Fulford claims, and there is no contrary evidence, that he learned that KEF did not have the dredge when he received notice that KEF was suing him for the deficiency under the Workout Agreement, and he initially thought it had been stolen. ECF No. 64-9 at 51-55.

For purposes of this case KEF retained an expert to retrospectively value the dredge. This individual, Fernando Sosa, valued the dredge at $70,000 using the cost approach; $102,000 using the sales comparison approach; and $47,000 using its scrap value. His overall estimated fair market sales value was $70,000. *See* ECF No. 64-4 through 64-8 (appraisal report).

---

[6] Mr. Farmer initially recalled that he sold the dredge for $175,000. In a second deposition Mr. Farmer indicated that the invoice refreshed his memory that the price was $185,000, not $175,000. ECF No. 64-16 at 23.

KEF asks the Court to hold Southwest in breach of both the Lease and the Workout Agreement, and to hold that Mr. Fulford is in breach of his guarantees of Southwest's performance under those agreements. KEF submits that the monetary result as of June 1, 2015 is:

| | |
|---|---|
| Amount owed as of date of sale of dredge: | $821,162.98 |
| Less appraised value of dredge ($70,000.00): | $751,162.98 |
| Interest accrued from date of sale of dredge to 6/1/15: | $252,418.16 |
| Per Diem interest: | $239.72 per day |
| Legal fees: | to be supplied |
| Costs: | to be supplied |
| Total amount due (not including legal fees and costs): | $1,003,581.10 |

Motion, ECF No. 64, at ¶56.

Defendants have not disputed the numbers as such, but they deny that they should be required to pay any amount to KEF for the reasons discussed below.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

I have noted certain disputes in my recitation of the facts. However, none of these disputes is material to the disposition of this case, nor does either party argue otherwise. The case hinges on interpretation of the parties' contracts and the application of the Colorado Uniform Commercial Code and relevant case law.

## CONCLUSIONS

**I.    Plaintiff's Motion for Summary Judgment, ECF No. 64.**

KEF's position is relatively simple and straightforward. Southwest defaulted under the Master Lease by not paying rent as agreed. Southwest defaulted under the Workout Agreement by not paying rent as agreed. Mr. Fulford defaulted under the Workout Agreement by not honoring his guarantee. KEF claims that it was entitled to sell the collateral, meaning the dredge, and that it did so in a commercially reasonable manner. Therefore, KEF claims that after reducing the debt to account for the value of the dredge, both defendants are liable for the deficiency plus interest, attorney's fees and costs.

Defendants respond with essentially two arguments: (1) KEF failed to give them notice of the sale of the dredge and therefore forfeited its right to collect a deficiency; and (2) KEF has not established that the sale was conducted in a commercially reasonable manner. I look at those arguments in turn.

**A.    Notice of Sale**

The parties agree that the Uniform Commercial Code as adopted in Colorado applies to this case. Under C.R.S. § 4-9-611(b), a secured party that disposes of collateral after a default

must provide the debtor with a notice of disposition. Notice must be sent at least 10 days before disposition. C.R.S. § 4-9-612.[7] Defendants argue that KEF failed to comply with the statutory notice requirement and, as a remedy, they request that the Court dismiss the complaint.

KEF responds that defendants waived the notice requirement when they entered into the Workout Agreement. Under § 4-9-624(a) of the UCC, a debtor may waive its right to notification of disposition of collateral under § 4-9-611 but "only by an agreement to that effect entered into and authenticated after default."[8] That, KEF argues, is what happened here. On the specific facts of this case I agree with KEF.

Southwest defaulted on its obligation to pay rent under the Master Lease. Thereafter, the parties entered into the Workout Agreement. They agreed that the Workout Agreement would terminate upon any material breach of its terms. ECF No. 1-4 at ¶5. They further agreed that upon termination of the Workout Agreement the total indebtedness then outstanding would be due and owing "without further demand, presentment, notice of dishonor and protest *or any other notice to SOUTHWEST or either of the Guarantors whatsoever*, and Lessor may exercise all rights and remedies available, as stated in the Lease Documents, under the Uniform Commercial Code, or otherwise at law." (emphasis added). The rights provided to KEF under the Master Lease included KEF's right to take possession of and sell the collateral and Southwest's waiver of defenses (but not a waiver of Southwest's right to pursue any claim

---

[7] This is the period of notice specified in the Master Lease as well. ECF No. 1-2 at ¶18(c).

[8] This is similar to an earlier version of the Code which required notification if the debtor "has not signed after default a statement renouncing or modifying his right to notification of sale . . . ." *See May v. Women's Bank, N.A.,* 807 P.2d 1145, 1146-47 (Colo. 1991).

against KEF in a separate action). ECF No. 1-2 at ¶¶8 and 18(b).  The Workout Agreement reiterates Southwest's and the guarantors' waivers of defenses.  ECF No. 1-4 at ¶¶3 and 4.

Collectively these provisions are very broad.  I do acknowledge, as defendants have argued, that in *Burdick v. Tucker,* 780 P.2d 34 (Colo. App. 1989), the court held that a post-default waiver of notice of the disposition of collateral "can be made only when the debtor *knowingly* and *specifically* agrees to waive his right to such notice." *Id.* at 36 (emphasis in the original).  But the facts here are quite different from those in *Burdick*.  In this case the parties are sophisticated businessmen, negotiating the terms of a workout on the lease of a piece of equipment purchased for more than $700,000.  Not only did Mr. Fulford agree to waive any notice "whatsoever" in the Workout Agreement, but when he effectively abandoned the dredge in May of 2010, he told Mr. DaVisio of KEF that the dredge was "ready to be sold or repossessed or whatever." ECF No. 64-9 at 76.  While the question is a close one, I conclude that the waiver of any notice whatsoever included the waiver of the requirement of 10 days' notice of the sale of the disposition of the collateral.

More importantly, however, even if these facts were determined not to constitute an effective waiver of defendants' right to be notified of the proposed sale of the dredge to Mr. Farmer, defendants have not come forward with any evidence that the failure caused them to sustain losses or damages.[9]  The purpose of the notice provision is to allow the debtors to protect their interest "either by paying the debt prior to sale and thereby redeeming the property, or by seeking out potential purchasers to assure that the sales price does not fall below its fair market value." *Burdick,* 780 P.2d at 35.  But defendants have presented no evidence (or argument) that

---

[9] A secured party is liable for damages caused by a failure to comply with the requirements of the UCC. *See* C.R.S. § 4-9-625.

had they received 10 days' notice, they would or could have paid the debt and redeemed the dredge. They have presented no evidence (or argument) that they would or could have produced a buyer who would have purchased the dredge at a higher price. Although Mr. Fulford claims to have looked for a buyer during the approximately two years after he abandoned the dredge, he received no offers. Defendants have presented no evidence (or argument) that they would or could have caused Mr. Farmer to pay more for the dredge, or that they would or could have done anything else to protect their interests.

There is, in short, no genuine dispute of fact as to whether KEF's non-compliance with the notice requirement of the Code, if indeed it were determined that there was non-compliance, caused defendants to sustain any losses or damages. Defendants instead cite *Colorado Leasing Corp. v. Borquez,* 738 P.2d 377, 379-80 (Colo. App. 1986) for the proposition that failure to provide notice gives rise to a rebuttable presumption that the value of the collateral at the time of its sale was equal to the amount of the debt. On that basis they suggest that dismissal of the complaint is an appropriate remedy for what, on these facts, amounts at most to a technical violation of the notice requirement.

However, the facts of this case, beyond any genuine dispute, rebut the presumption. The sustained but unsuccessful efforts of ACS to sell the dredge even though ACS was asking much less than the amount of the debt; the unsuccessful efforts of Mr. Fulford to find any buyer for the dredge; ACS's several valuations of the dredge, particularly its re-evaluation after Mr. Stratman's fourth inspection in July 2012; and the opinion of KEF's retained expert, all give lie to the notion that the dredge's value when it was sold was equal to, or even remotely close to, the

amount of the debt. Defendants have come forward with no evidence that would suggest that the presumption has any support in the actual facts of this case.

In my view, the real issue in this case is not whether KEF had a right to dispose of the dredge but whether, as Mr. Fulford characterized it, KEF effectively gave it away. *See* ECF No. 64-9 at 81. I turn to that issue next.

### B. Was the Sale Commercially Reasonable?

The UCC provides guidance for determining whether the sale of collateral was commercially reasonable. It states:

> The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

C.R.S 4-9-627(a).

Rather, disposition of collateral is made in a commercially reasonable manner if it is made either (1) in the usual manner in any recognized market, or (2) at the price current in any recognized market at the time of the disposition, or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that as the subject of the disposition. *Id.* at (b)(1-3).

One must bear in mind that KEF began the process of disposing of the dredge in May 2010. This followed Southwest's having permitted the dredge to be transported to Nebraska without KEF's knowledge or consent. It followed Southwest's sublessee's exposure of the dredge to damage caused by submersion in freezing water and ice. It followed Southwest's

effective abandonment of the dredge. It followed an eight-month period during which Southwest had stopped paying rent or providing insurance for the dredge.

KEF approached the problem in a reasonable manner. First, it engaged ACS, a company with experience in inspecting and evaluating commercial equipment including dredges, to assess the condition of the dredge. ACS in turn hired a local individual who had knowledge and experience with dredges to assist in the process. After the condition had been determined, and a rough estimate of the fair market value of the dredge had been provided, KEF asked ACS to try to find a buyer. This was in December 2010, by which time KEF had not received a rent payment from Southwest for more than a year.

ACS was experienced in the marketing of equipment of this type. It listed the dredge at the high end of its fair market valuation plus some negotiation room. ACS worked the Internet, and it had its sales people directly contact possible buyers. Mr. Fulford meanwhile was apparently making some efforts to find a buyer on his own, but that came to nothing. ACS's efforts to sell the dredge continued for approximately one and a half years without success. Meanwhile, the dredge was again flooded when the Missouri River overflowed.

Finally in July 2012 Mr. Farmer informed ACS of the flooding and made an offer to purchase the dredge, which he characterized as junk, for $75,000. This was significantly less than the fair market value estimate that ACS had given KEF in June and December 2010. So, ACS had the dredge inspected again. Mr. Stratman informed ACS that the dredge was once again inoperable and in poor condition. At that point Mr. Hutchinson's opinion that $75,000 was below market value changed. And it was in that context that KEF instructed ACS to accept Mr. Farmer's offer.

The Court finds that KEF through ACS had made substantial efforts to sell the dredge in the recognized market for used dredges. ACS was marketing the dredge consistent with its evaluation of the dredge's fair market value, but it received no offers over a sustained period. Its ultimate decision that the value of the dredge was essentially consistent with Mr. Farmer's offer was based on Mr. Stratman's post-flood inspection. It is hard to criticize KEF for selling the dredge to Mr. Farmer at that point. Its effort to obtain a higher price for the dredge had been reasonable and sustained. Meanwhile, Mr. Fulford was paying nothing and effectively doing nothing to assist in the disposition of the collateral.

I conclude that in the circumstances the sale was in conformity with reasonable commercial practices among dealers in used dredges. Mr. Farmer was the only such dealer who made any offer. The fact that his offer was for less than what Mr. Fulford apparently thought the dredge was worth does not establish that the proposed sale price was commercially unreasonable. *Cf. Flexisystems, Inc. v. American Standards Testing Bureau, Inc.,* 847 P.2d 207, 209 (Colo. App. 1992) (crediting the debtor with the liquidation value rather than the fair market value of replevied property is not dispositive of commercial unreasonableness). The fact that Mr. Farmer was able to resell the dredge at a higher price does not make KEF's sale commercially unreasonable. Mr. Farmer was an experienced and savvy buyer and seller of used dredges. There is no reason to assume that he would have made any offer had he not thought he could make a profit on it.

I note as well that after this litigation was filed, KEF retained an expert to provide a retrospective opinion of the value of the dredge when it was sold. The CV of this individual, J. Fernando Sosa, represents that he is "an Accredited Senior Appraiser in the discipline of

Machinery &Technical Specialties with the American Society of Appraisers." ECF No. 64-7. Among other things Mr. Sosa consulted with Rick King of Dredge Central (apparently the company with which Mr. Fulford had listed the dredge) and Jerry Gladwell of Ellicott Dredges, LLC (the manufacturer of the dredge in question here). Based upon application of three different appraisal approaches he expressed the opinion that the dredge had an estimated fair market sale value of $70,000 as at July 12, 2012. ECF No. 64-4 at 3. His report discusses the appraisal methods and the facts on which the opinion rests in detail. *See generally* ECF No. 64-4 through ECF No. 64-8. Defendants have not come forward with any contrary expert opinion evidence.

Accordingly, the Court concludes that there is no genuine dispute as to any material fact, and that KEF is entitled to judgment against both defendants as a matter of law. However, the Court is not yet convinced by the plaintiff's damages numbers. I have no reason to question (and defendants did not question) the representation in ¶56 of plaintiff's list of purportedly undisputed facts that the amount owed as of the date of the sale of the dredge was $821,162.98. ECF No. 64 at 11. However, I do not understand the reasoning (and none was provided) behind the deduction of the $70,000 appraised value of the dredge as determined by plaintiff's expert. Notwithstanding the expert's opinion, the fact is that KEF was paid $75,000 for the dredge. If fair market value as opposed to the actual sale price is the measure, then why would the expert's opinion take precedence over the two actual sales of the dredge that occurred in July 2012?

The Court directs counsel for the parties to confer, in good faith, concerning (1) the amount of the deduction, (2) the pre-judgment interest accrued through the date of this judgment; (3) post-judgment interest; (4) reasonable attorney's fees, and (5) costs. If agreement cannot be reached, then plaintiff should schedule an evidentiary hearing to resolve those issues.

**II.     Defendants' Motion for Partial Summary Judgment, ECF No. 63.**

This motion is essentially the flip side of plaintiff's motion, and for the reasons discussed in respect to plaintiffs' motion, defendants' motion is denied.

**ORDER**

Plaintiff's motion for summary judgment, ECF No. 64, is GRANTED as to liability. Defendants' motion for partial summary judgment, ECF No. 63, is DENIED.  Judgment will enter in favor of the plaintiff, Key Equipment Finance, and against the defendants, Southwest Contracting, Inc. and Matthew Davis Fulford, jointly and severally, in an amount to be determined either by agreement or after hearing as indicated above.

.       DATED this 3rd day of September, 2015.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge